U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed March 8, 2006

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RONALD D. WELLS, | § | CASE NO. 05-34432-BJH-7 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| RHONDA HUGHES and RONALD | § | |
| HUGHES, SR., | § | |
| Plaintiffs, | § | ADV. PRO. 05-3594-BJH |
| - against - | § | |
| | § | |
| RONALD WELLS, | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the complaint filed by Rhonda Hughes Montee ("Rhonda") and Ronald

Hughes, Sr. ("Hughes Sr.") (collectively, the "Plaintiffs" or "Hughes") on August 4, 2005 (the

"Complaint"). By way of the Complaint, the Plaintiffs seek "a judgment for non-dischargeability for

**Memorandum Opinion and Order**

fees paid in the amount of $435,000." Compl. ¶ 44. Specifically, the Plaintiffs allege claims in the Complaint pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). Ronald Wells (the "Debtor" or "Wells") filed an answer to the Complaint, and on January 9, 10, and 12, 2006, the Court tried the Complaint. The Court heard the testimony of Wells, George Milner ("Milner"), Gary Udashen ("Udashen"), Rhonda, and former United States District Judge Joe Kendall ("Judge Kendall"), and received various documentary exhibits into evidence. On February 21, 2006, the Court heard closing arguments, and thereafter took the Complaint under advisement. Both parties have filed post-trial briefs.

This Court has subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). Venue is proper here. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## I.    Factual and Procedural Background

Hughes Sr., his son, Hughes Jr., and others had a criminal action filed against them in the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:94-CR-075-X, *U.S.A. vs. Ronald W. Hughes, Sr. et al* (the "Criminal Suit"). Hughes Sr. retained Cam Zachry ("Zachry") and his law firm, Jenkins & Gilchrist ("J&G"), to represent him in the Criminal Suit. Hughes Jr. retained Milner to represent him in the Criminal Suit. After a jury trial in the Criminal Suit, Hughes Sr. was found guilty of money laundering and sentenced to serve time in federal prison. Hughes Jr. was acquitted.

J&G appealed Hughes Sr.'s conviction to the Fifth Circuit Court of Appeals, which affirmed the jury's verdict. The United States Supreme Court denied certiorari, making the conviction final.

Thereafter, Zachry recommended that Hughes Sr. retain Wells to review all of the documents

concerning Hughes Sr.'s trial and sentencing to see what other avenues might be pursued to obtain Hughes Sr.'s release from prison. Zachry recommended Wells because Wells was (i) an experienced criminal lawyer, and (ii) a close friend of the judge who presided over the Criminal Suit – *i.e.*, Judge Kendall. The Hughes decided to consult with Wells to see what, if any, relief might be available to Hughes Sr.

On January 19, 1998, Wells sent a letter to Zachry stating that "there is only one slim hope for any success on obtaining any relief for [Hughes Sr.]," Debtor Ex. 8 at p. 1, and recommending the filing of a petition for writ of habeas corpus under 28 U.S.C. § 2255 (the "Habeas Petition") on Hughes Sr.'s behalf. Wells concluded his letter by stating that "[t]his will be a very difficult argument to make successfully, and even if Judge Kendall grants this relief, the family and client should consider that the government will likely appeal." *Id*. at p. 2. A copy of this letter was sent to Rhonda. *Id*. Wells was paid for this work on an hourly basis. Plaintiffs' Ex. 5.

Because Hughes Sr. was in prison, he gave his daughter, Rhonda, his power of attorney. Hughes Sr., acting through Rhonda, decided to retain Wells to handle the Habeas Petition. Accordingly, Hughes Sr., Rhonda, and Wells entered into a "Contract for Employment for Legal Services" dated February 2, 1998 (the "First Contract"). Debtor Ex. 1. Pursuant to the First Contract, Wells agreed to represent Hughes Sr. in the investigation and preparation of the Habeas Petition. In exchange, the Hughes agreed to pay Wells $125,000 for these services, along with a $10,000 expense deposit. The monies were paid up front and in advance for the services to be rendered. Specifically, the First Contract provided that:

> Client further understands and agrees that should these matters be dismissed or settled in any manner, NO part of the Attorneys' fee is to be refunded to Client. Because of Attorneys' commitment to handle this matter, Client further understands and agrees that Attorneys' fees set out above will be considered by all parties as earned at the

time of payment, and no part of that fee will be refunded to the Client.

*Id*. at p. 2 (emphasis in original) (the "Non-Refundable Provision").

At the time the First Contract was entered into, the Hughes were told that Udashen, a lawyer that Wells shared offices with, would work on the Habeas Petition with Wells. Although the First Contract had a signature block for Udashen, he never signed that contract. Udashen was to be paid out of the fees Wells received under the First Contract.

Although Udashen did not sign the First Contract, he did work with Wells on the Habeas Petition and he was paid by Wells for his work. The Habeas Petition contained nine points of error. Wells and Udashen prevailed on the first point of error before the United States Magistrate Judge to whom the Habeas Petition was referred, Judge Jane Boyle. Accordingly, on February 23, 1999, Judge Boyle entered her report and recommendation to Judge Kendall, pursuant to which Judge Boyle recommended that Hughes Sr.'s conviction be vacated (the "Report and Recommendation"). The other points of error set forth in the Habeas Petition were not addressed by Judge Boyle in the Report and Recommendation.

Following the entry of the Report and Recommendation, Wells and the Hughes entered into a second "Contract for Employment for Legal Services" dated March 4, 1999 (the "Second Contract"). Debtor Ex. 2. The Second Contract stated that it was for "[r]epresentation after Findings, Conclusions and recommendations [sic] of U.S. Magistrate Judge." *Id*. at p. 1. The Second Contract further stated that

> [i]t is agreed that this employment is for the purpose of negotiating a settlement of the criminal sentence and/or seeking a sentence reduction to allow release. The fee includes any appeal to the District Judge and any appeal to the Fifth Circuit. In the event a New Trial is granted and no settlement can be obtained, a separate fee shall be required prior to any representation in a new trial.

*Id*.  The Second Contract required a series of payments totaling $150,000 pursuant to a set schedule, with an additional $25,000 due in the event of an appeal.  The Second Contract also contained the Non-Refundable Provision.  Udashen signed the Second Contract, and no claims have been made under the Second Contract.

After further hearings on the Habeas Petition before Judge Kendall, Judge Kendall granted the Habeas Petition on June 30, 1999 and vacated Hughes Sr.'s conviction.  At that time, Judge Kendall set the Criminal Suit for a new trial on September 20, 1999.  Debtor Ex. 9.  And, at Wells' request, Hughes Sr. was released from prison on a personal recognizance bond.

On July 16, 1999, Wells and the Hughes entered into a third "Contract for Employment for Legal Services" (the "Third Contract").  Debtor Ex. 3.  The Third Contract stated that it was for "Representation after Granting of Writ and New Trial."  *Id*.  The Third Contract further stated:

> It is agreed that this employment is for the purpose of representation in the above-referenced matter and is in addition to any fees previously paid and in no way changes the terms of prior agreements.  The fee includes representation through all District Court proceedings but does not include a re-trial if the trial results in a hung jury.

*Id*.  The Third Contract required the payment of $300,000 to Wells, along with an additional $25,000 in the event of an appeal to the Fifth Circuit following a new trial.  The Third Contract also stated that:

> Client further understands and agrees that should these matters be dismissed or settled in any manner, NO part of the Attorney's fee is to be refunded to Client unless this matter settles on or before August 23, 1999, in which event the total fee shall be $125,000.  In the event a negotiated settlement occurs in regard to the forfeited two million dollars, a separate compensation agreement will entered into.  Because of the Attorneys' commitment to handle this matter, Client further understands and agrees that Attorneys' fees set out above will be considered by all parties as earned at the time of payment and no part of that fee will be refunded to the Client."

*Id*. at p. 2 (the "Modified Non-Refundable Provision").

While the Third Contract contained a signature block for Udashen, he did not sign the Third Contract. However, Udashen expected to participate in any new trial of the Criminal Suit and he expected to be paid for his services by Wells out of the $300,000 Wells received under the Third Contract.

Wells and Udashen told the Hughes several different times that the government would appeal the grant of a new trial. Initially, Wells alerted the Hughes to a likely appeal when he first recommended pursuit of the Habeas Petition by letter dated January 19, 1998. Debtor Ex. 8. The Hughes were well aware of the likelihood of a government appeal prior to the payment of the $300,000 fee called for by the Third Contract. Tr. 1/9/06, 82:7-13 (Wells testified that "I told everyone from day one, there's a likelihood the government will appeal any favorable result"); *id*. at 112:12-17.

On August 27, 1999, the government appealed Judge Kendall's grant of a new trial in the Criminal Suit to the Fifth Circuit. The Fifth Circuit reversed the grant of the new trial and reinstated Hughes Sr.'s conviction. On October 30, 2000, the Fifth Circuit denied Hughes Sr.'s petition for rehearing. Shortly thereafter, Hughes Sr. was returned to prison where he remains today.

Obviously, after the Fifth Circuit reversed the grant of the new trial and reinstated Hughes Sr.'s conviction, no new trial occurred. However, there were still grounds in the Habeas Petition that had never been ruled upon by either Judge Boyle or Judge Kendall. After the reversal of the grant of the new trial, Wells has not (i) asked the district court to rule on the remaining grounds in the Habeas Petition, (ii) sought to obtain Hughes Sr.'s release based upon the holding of a recent Supreme Court decision, (iii) sought a Presidential pardon for Hughes Sr., or (iv) sought a compassionate release for Hughes Sr.

On December 31, 2002, the Hughes made demand on Wells for the return of the $300,000 paid to him in connection with the Third Contract, contending, *inter alia*, that because no new trial occurred, Wells did not earn those fees. In late March 2003, the Hughes filed suit in state district court in Dallas County against Wells, Milner, Udashen, and others (the "State Court Suit"), seeking a return of $435,000 in fees – *i.e.*, those fees paid under the First Contract and the Third Contract. Two claims were asserted in the State Court Suit: (i) for declaratory judgment that the Fee Contracts[1] were unconscionable and unenforceable, and (ii) for breach of the Fee Contracts, thereby entitling the Hughes to damages in the amount of $435,000. Wells answered the State Court Suit by general denial on April 21, 2003. The State Court Suit was dismissed for want of prosecution prior to Wells' Chapter 7 filing. However, after Wells' bankruptcy filing, the automatic stay was modified by agreement of the parties to permit the State Court Suit to be reinstated and then abated, pending the outcome of proceedings here.

In June 2003, the Hughes filed a grievance against Wells with the State Bar of Texas, which was re-filed in July 2003 (the "Grievances"). The claims asserted in the State Court Suit formed the basis of the Grievances. The State Bar's Office of the Chief Disciplinary Counsel reviewed and dismissed the Grievances. Debtor Exs. 6 & 7.

## II. Legal Analysis

### A. Do the Hughes Hold a Debt?

#### i. Are the Fee Contracts Unconscionable?

Under Texas law, courts endeavor to give effect to the intention of the parties in entering into a contract; in fact, "[i]t is the general rule of law of contracts that where an unambiguous writing has

---

[1]As used herein, Fee Contracts refers to the First Contract and the Third Contract, collectively.

been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968). Because the courts favor giving effect to the parties' intentions as embodied in their agreement, a contract will be upheld unless there are grounds at law or in equity that warrant its revocation, including fraud or unconscionability. *Service Corp. Intern. v. Lopez*, 162 S.W.3d 801 (Tex. App. – Corpus Christi 2005). Unconscionable contracts are unenforceable. *Ski River Development, Inc. v. McCalla*, 167 S.W.3d 121, 135 (Tex. Ct. App.–Waco 2005).

The basic test for unconscionability "is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. The principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001). A disparity in bargaining power, while relevant, "is not the litmus test for unconscionability. Something more must be shown. How much more is a difficult question, however, because the term unconscionable has no precise legal definition." *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J., concurring).

> In Texas,
>
> although many factors are relevant and no single formula exists, proof of a claim of unconscionability begins with two broad questions: (1) how did the parties arrive at the terms in controversy; and (2) are there legitimate commercial reasons which justify the inclusion of those terms? The first question, often described as the procedural aspect of unconscionability, is concerned with assent and focuses on the facts surrounding the bargaining process. The second question, often described as the substantive aspect of unconscionability, is concerned with the fairness of the resulting agreement.

*Id*. at 498-499 (Gonzalez, concurring).

Addressing the issue of unconscionability, the Texas Court of Appeals recently stated:

> In determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made; the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy; and, whether the contract is oppressive or unreasonable. At the same time, a party who knowingly enters into a lawful but improvident contract is not entitled to protection by the courts. In the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or imprudence of contracts and agreements voluntarily entered into between parties *compos mentis* and *sui juris*. Such parties to contracts have the right to insert any stipulations that may be agreed to, provided they are neither unconscionable nor otherwise illegal or contrary to public policy. It has accordingly been said that, almost without limitation, what the parties agree upon is valid, the parties are bound by the agreement they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily. A contract is not unenforceable on the ground that it yields a return disproportionate to the expenditures in time and money, where there has been no mistake or unfairness and the party against whom it is sought to be enforced has received and enjoyed the benefits.

*In re Big 8 Food Stores, Ltd.*, 166 S.W.3d 869, 877-78 (Tex. Ct. App.–El Paso 2005).

An in-depth analysis is required in deciding whether or not the contractual term at issue is unconscionable. The court must look to the "totality of the circumstances" at "the time the contract was formed." *Ski River Development, Inc.*, 167 S.W. 3d at 136. In analyzing these questions,

> [i]t is important to consider whether there is any gross disparity in the values exchanged. Gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. Factors that may contribute to an unconscionable bargaining process include: (1) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; and (2) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement. The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse--the circumstances surrounding the negotiations must be shocking.

*Id.* The issue of "unconscionability must be determined on a case-by-case basis," *Pony Express Corp. v. Morris*, 921 S.W.2d 817, 821 (Tex. App. – San Ant. 1996), and it is ultimately a question of law to be determined by the court. *Ski River Development, Inc.*, 167 S.W.3d at 136. However, "[u]nder Texas law, the party asserting unconscionability of a contract bears the burden of proving both procedural and substantive unconscionability." *Id*.

Armed with this understanding of the law of contract unconscionability in Texas, the Court will analyze each of the Fee Contracts in turn. Starting with the First Contract, the Court finds that the atmosphere surrounding the execution of the First Contract was not oppressive. The Hughes were under no obligation to hire Wells when they were shopping for a lawyer to pursue post-conviction remedies on behalf of Hughes Sr. They chose to hire Wells because he was the lawyer Zachry recommended to them – both for his criminal expertise and for his relationship with Judge Kendall.[2] Moreover, the Non-Refundable Provision contained in the First Contract is not illegal in Texas. Tex. Eth. Op. 431, 1986 WL 69161 (Tex. Prof. Eth. Comm.) (Non-refundable retainers are not inherently unethical, but must be utilized with caution); *see also Walton v. Hoover, Bax & Slovacek, L.L.P.*, 149 S.W.3d 834 (Tex. App – El Paso 2004) (stating that nonrefundable retainers are reviewable for their reasonableness, and implicitly recognizing their legality). According to the testimony of Wells, Milner, Udashen, and Judge Kendall, many, if not most, criminal lawyers in Texas ask clients to enter into these type of "earned on receipt" or non-refundable fee agreements.

---

[2]The Hughes now argue that Rhonda did not "like Wells" when she hired him, but "took some comfort in the fact that Milner was part of the firm and Udashen would be actually drafting the papers for her father. Milner and Udashen enjoy good reputations in Dallas, Texas as criminal attorneys and Milner had already won the acquittal of her brother." Post-Trial Brief of Plaintiffs, docket no. 30, (the "Hughes' Brief") at p. 7. If true, that means that Wells was hired solely to take advantage of his relationship with Judge Kendall. In any event, whether Rhonda "liked" Wells is not relevant to any legal issue to be addressed by the Court, although it may explain, in part, the hard feelings that obviously exist between the parties.

Moreover, there was no gross disparity in the values exchanged by Wells and the Hughes under the First Contract. Wells and Udashen persuaded Judge Kendall that Hughes Sr. did not get a fair trial and Hughes Sr.'s conviction was vacated accordingly. The grant of the Habeas Petition resulted in Hughes Sr.'s release from prison for more than 16 months, while the government appealed that decision to the Fifth Circuit. While Rhonda complains about Wells' failure to pursue the remaining grounds in the Habeas Petition after the Fifth Circuit reinstated Hughes Sr.'s original conviction and her father was returned to prison, the evidence is undisputed that there is no chance that the district court will grant relief based upon the remaining grounds in the Habeas Petition. In addition to the apparent futility of arguing the remaining Habeas Petition issues, Udashen is not optimistic about any of the other remedies that Rhonda contends Wells was required to pursue under the First Contract, but failed to pursue. In short, the only thing that Udashen hopes may be successful in obtaining Hughes Sr.'s release is the so-called "compassionate release." However, this remedy arises from Hughes Sr.'s current medical condition, not something asserted in the Habeas Petition or contemplated by the parties in the First Contract.

After considering the totality of the circumstances, the Court cannot conclude that the First Contract is unconscionable. The Hughes obtained substantial benefits from Wells' services under the First Contract, the fee paid was reasonable, and Wells earned that fee.[3]

The Third Contract presents a more difficult analysis, however. Fundamentally, the Hughes contend that because no new trial occurred, it is unconscionable for Wells to retain the full $300,000 fee they paid for such a new trial under the Third Contract. In response, Wells contends that because there was a trial setting in about sixty days at the time the Third Contract was executed (the contract

---

[3] Accordingly, the First Contract also satisfies the more relaxed standard of unconscionability which this Court concludes would be applied to attorney's fee contracts in Texas, discussed *infra* at pp. 16-23.

was executed on July 16 and trial was set for September 20), he needed to proceed with his trial preparation and he needed to be paid for his services. According to Wells, Judge Kendall was known to be inflexible about his trial settings, and there was no chance of a continuance of that trial setting if the government did not appeal the grant of a new trial. Further, according to Wells, the second trial of Hughes Sr. would be a difficult one, based upon both the original charges and Hughes Sr. being "locked in" by his damaging admissions during the first trial. Accordingly, Wells contends that he had no choice – he needed to get started on his trial preparation (notwithstanding the fact that an appeal would likely be filed by the government in late August, which would result in Judge Kendall vacating the trial setting), and if the Hughes wanted to retain him to handle the new trial, he needed the protections of the Third Contract.

Rhonda testified that in early July, 1999, just after Hughes Sr. had been released from prison, Wells called a meeting and asked that Hughes Sr. and she come to his office to discuss the new trial and to discuss the fees that would be required for a new trial. According to Rhonda, Wells told them it would be a three week trial, and that it was very important that Wells, Milner, and Udashen all participate, and the decision needed to be made quickly so that the three attorneys could decide "what parts each of them were going to be taking." Tr. 1/9/06, 266:19 - 269:7. Rhonda further testified that Wells quoted her a fee of approximately $525,000, and when she explained she could not afford that fee, Wells told her "you're going to have to do this or your dad's going back to jail," and she testified that "dad was just white at that point." *Id*. at 269:15-18. She further testified that the parties settled on a fee of $300,000 for the participation of Wells and Udashen at the new trial. Finally, Rhonda testifed that Wells told her that if she didn't sign the agreement, she "could go look for another attorney, and that there was no attorney in Dallas that [she] would be able to get for

anywhere near this on such short notice with all of the reading and everything else that . . . he had already done." *Id.* at 270:16 - 271:5.

The Hughes went ahead and signed the Third Contract on July 16, 1999, even though they were aware that the government would likely appeal the grant of the new trial, that such an appeal would vacate the pending trial setting, and that if the Fifth Circuit reversed the grant of a new trial, no new trial would ever occur. While Rhonda testified that Wells continually assured her there "would be a new trial," Wells contends that he never guaranteed Rhonda that a new trial would occur. Rather, according to Wells, he explained that he thought there would be a new trial because there was a stronger chance of a Fifth Circuit affirmance than there is in a normal criminal appeal. Specifically, Wells testified that he believed there was a lesser likelihood of a reversal in the Hughes case than in the "normal Fifth Circuit appeal, where it is a prisoner complaining that his lawyer didn't do this or that, or that the trial wasn't fair, the judge wasn't fair," Tr. 1/9/096 89:18-90:6, "since the conclusions were Judge Jane Boyle, a former U.S. Attorney, and Judge Joe Kendall. So I didn't get into depth with [Rhonda], but I always felt we had a stronger chance of affirmance because of the kind of opinion going up, versus the normal appeal in a criminal case going up." *Id.* Rhonda also complains about the fact that she felt coerced to fund the Third Contract. While the Third Contract was signed on July 16, 1999, Rhonda did not fully fund it until August 4, 1999. According to Rhonda, Wells called her on the morning of an important meeting with Judge Kendall and the prosecutor, and told her that he would not attend the meeting and her father would be returned to jail if she did not get the monies called for by the Third Contract to him before the meeting. So, according to Rhonda, she rushed around, withdrew monies from her Swiss Avenue Bank account, *see* Plaintiffs' Ex. 14, and delivered a cashier's check to Wells before his lunch meeting with Judge

Kendall.

Not surprisingly, Wells has a different version of the story. While Wells doesn't remember if his conversation with Rhonda occurred on the day of his lunch meeting with Judge Kendall and the prosecutor, he testified that he told Rhonda that if she didn't go ahead and fund the Third Contract, he would ask Judge Kendall to allow him to withdraw for non-payment of fees; that he thought Judge Kendall would allow him to withdraw for that reason; that he thought the Hughes would have difficulty finding another lawyer so close to the September 20 trial setting; and, that if Hughes Sr. did not have an attorney of record in the Criminal Suit, Hughes Sr.'s release on a personal recognizance bond would likely be discontinued by Judge Kendall, thereby causing Hughes Sr. to be returned to prison unless the Hughes were able to post a money bond.[4]

These factual disputes require the Court to decide which witnesses' testimony is more credible – Rhonda or Wells.[5] With regard to some of the factual inconsistencies between Rhonda's testimony and Wells' testimony, the inconsistencies appear to be driven by misunderstandings. For example, while the Court understands how Rhonda may have heard only how Wells would ask his friend, Judge Kendall, to let him withdraw and that Judge Kendall would put her father back in jail, the Court does not believe that is what Wells said. Wells' testimony follows logically. He felt the need to be paid; if he wasn't paid he would ask to withdraw for non-payment; if he was permitted to withdraw, it could be difficult to hire new counsel so close to a pending trial setting; and if Hughes Sr. did not

---

[4]Although a bit unusual, Judge Kendall, who has resigned his position as a federal district judge and now practices criminal defense law, testified that as a judge, he didn't usually allow a personal recognizance bond release when the criminal defendant did not have counsel, because in his experience, the chances of flight increase if there is not a lawyer shepherding the client.

[5]The Court offers certain observations about each witnesses' credibility on pages 31-32, *infra*. Those observations are equally applicable here.

have counsel, his personal recognizance release would be set aside, resulting in Hughes Sr.'s return to prison or the Hughes' posting of a money bond to continue his release. However, other inconsistencies in their testimony are more difficult to resolve.

A final predicate fact must be discussed before returning to the ultimate question of whether it is unconscionable for Wells to retain the full fee when no new trial occurred. As noted previously, the Third Contract contained a Modified Non-Refundable Provision. Specifically, Rhonda bargained for the inclusion of a provision in the Third Contract that required a $175,000 refund of the fee to be paid if "this matter settles on or before August 23, 1999," Debtor Ex. 3, a date shortly before the due date of a government appeal. And, Wells presented the Hughes with the opportunity to take advantage of this refund provision.

Specifically, as a result of Wells' meetings with the government, a potential deal was negotiated which would have caused Hughes Sr. to be released for time already served. Under the potential deal, Hughes Sr. would cooperate with the government and testify about the activities of his son-in-law, James Montee (Rhonda's husband), at a mausoleum owned by the Hughes. At the time of the mausoleum incident, Montee was an active FBI agent who was subsequently "separated" from employment with the FBI for "gross misconduct." Debtor Ex. 4. Montee appealed his separation administratively, and the government was interested in Hughes Sr.'s testimony, which the government felt would assist it in disposing of Montee's administrative appeal, and would insure Montee's permanent separation from the FBI. At the lunch meeting among Wells, Judge Kendall, and the prosecutor discussed previously, Judge Kendall indicated that he would approve such a plea agreement. So, if Hughes Sr. would plead guilty to his indictment and testify about Montee's activities at the mausoleum, the government would not appeal the grant of the new trial and Hughes

Sr.'s sentence would be the time he had already served in prison. In short, Hughes Sr. would be a free man.

Wells presented the potential deal to Hughes Sr. and Rhonda during a meeting at his office. According to Wells, Hughes Sr. was interested in the deal initially for obvious reasons – it would cause his release from prison and would avoid the risk of a second conviction even if the grant of a new trial was upheld on appeal. However, according to Wells, Rhonda and Hughes Sr. left the meeting room and upon their return, Hughes Sr. rejected the potential plea bargain.[6] And, the opportunity to settle "this matter," and receive a $175,000 refund, before the August 23, 1999 deadline was lost. Shortly thereafter, the government appealed the grant of the new trial, the Fifth Circuit reversed the grant, and Hughes Sr. was returned to prison, where he remains today.

So, fundamentally, the issue comes back to a relatively simple proposition – is it unconscionable for Wells to retain the full fee when no new trial occurred? After considering the totality of the circumstances, the Court concludes that it is.

Despite the relatively high standard for unconscionability applied by the Texas courts under general contract law discussed previously, the Court concludes that Texas courts would apply a different criterion with respect to contracts for attorney's fees. This is so because lawyers "owe their clients greater duties than are owed under the general law of contracts." *Restatement (Third) of the Law Governing Lawyers*, § 34, cmt. B. It is true that the attorney-client relationship is one of contract. *Mellon Svc. Co. v. Touche Ross & Co.*, 17 S.W.3d 432 (Tex. App. – Houston [1 Dist.] 2000). But the attorney-client relationship is "characterized as highly fiduciary, and requires proof

---

[6]Rhonda did not dispute Wells' rendition of these facts. And, while hindsight is a wonderful thing, the Court notes that Montee's separation from the FBI for gross misconduct was upheld on appeal without Hughes Sr.'s assistance.

of perfect fairness on the part of the attorney." *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d

15, 22 (Tex. App. – Tyler 2000); *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. – Houston [14

Dist.] 2001) (stating that the attorney-client relationship requires "absolute perfect candor, openness

and honesty"). Therefore, "[w]hen construing contracts between lawyers and clients, it is not enough

to simply say that a contract is a contract. There are ethical considerations overlaying the contractual

relationship." *Walton v. Hoover, Bax & Slovacek, L.L.P.*, 149 S.W.3d 834, 845-46 (Tex. App. – El

Paso 2004) (*quoting Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex. 2000)

(Gozalez, J. concurring in part and dissenting in part)). While the Court's research has not revealed

a Texas case where a court has expressly applied a more relaxed standard of unconscionability to a

contract for attorney's fees, the Court is persuaded, given the other Texas precedent discussed below,

that with respect to a contract for attorney's fees, a Texas court would find that a contract which

provides for the payment of an unreasonable fee *is* an unconscionable contract. The Court comes to

this conclusion for several reasons.

First, Rule 1.04 of the Texas Disciplinary Rules of Conduct incorporates reasonableness into

the definition of unconscionability. That Rule provides that "a lawyer shall not enter into an

arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if

a competent lawyer could not form a reasonable belief that the fee is reasonable." Tex. Gov't. Code

Ann. T.2, Subt.G, App. A, Art. 10, § 9 (Vernon 2005). The reasonableness of attorney's fees are

measured by the factors set forth in section (b) of Rule 1.04:

> (b)     Factors that may be considered in determining the reasonableness of a fee include, but
> not to the exclusion of other relevant facts, the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved,
> and the skill requisite to perform the legal service property;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular
> employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Second, Texas courts have routinely used the factors set forth in Rule 1.04(b) to assess the reasonableness of attorney's fees in a variety of civil contexts. *See, e.g. Arthur Anderson & Co. v. Perry Equip. Corp*., 945 S.W.2d 812 (Tex. 1997) (stating that court should look to the Rule 1.04 factors to award attorney's fees under Texas's Deceptive Trade Practices-Consumer Protection Act); *Toshiba Machine Co., America v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 782 (Tex. App. – Fort Worth 2005) (stating that the factors set forth in Rule 1.04 are weighed to determine the reasonableness of attorney's fees awarded on a breach of contract claim under Tex. Civ. Prac. & Rem. Code § 38.001); *Kurtz v. Kurtz*, 158 S.W.3d 12 (Tex. App. – Houston [14 Dist.] 2004) (stating that agreed divorce decree is governed by contract law, and term in decree requiring reimbursement of attorney's fee is governed by Rule 1.04, in that reasonableness is an implied term in any contract for attorney's fees).  Courts have also refused to permit an attorney to recover a fee under an agreement which is unconscionable. *Walton v. Hoover, Bax & Slovacek, L.L.P.*, 149 S.W.3d 834 (Tex. App. – El Paso 2004) (refusing to enforce termination provision in attorney fee contract where the fee was unreasonable in light of the work performed and where it bore no relationship to consideration the lawyer provided).

Third, Texas courts have also, in ruling on fee disputes, looked to the Restatement (Third) of the Law Governing Lawyers (the "Restatement") for guidance. *Levine v. Bayne, Snell & Krause, Ltd*., 40 S.W.3d 92 (Tex. 2001) (*citing* section 35 of the Restatement); *Walton*, 149 S.W.3d at 845.

The Restatement provides that the appropriate standard to apply to attorney's fee contracts is one of reasonableness. Section 34 of the Restatement provides that "a lawyer may not charge a fee larger than is reasonable in the circumstances or that is prohibited by law." The Comment to section 34 indicates that the section applies in fee disputes between lawyers and clients, and "a fee will not be approved to the extent that it violates this section even though the parties had agreed to the fee." *Restatement (Third) of Law Governing Lawyers*, § 34 cmt. a (2000). Section 34 applies "in proceedings such as suits by lawyers for fees, suits by clients to recover fees already paid, and fee-arbitration proceedings." *Id*.

Moreover, under Texas law, all attorney's fees, including nonrefundable retainers, are "reviewable for their reasonableness and may be found unconscionable if they are excessive under the circumstances of a particular case." *Walton*, 149 S.W.3d at 845 (*dictum* as to nonrefundable retainers); *In re Dixon*, 143 B.R. 671, 678 n.6 (Bankr. N.D. Tx. 1992) (reviewing fees under 11 U.S.C. § 329 but stating that under Texas law, a flat fee paid to a criminal attorney "cannot be used as a device to circumvent those provisions of the disciplinary rules concerning the refundability of retainers and excessiveness of fees").

While the Ethics Opinions issued by the Supreme Court of Texas's Professional Ethics Committee do not impose civil liability upon an attorney but merely state the circumstances under which the attorney may be disciplined, they also persuade this Court that a Texas court would require, in a civil context, the refund of fees which are determined to be excessive in light of the services performed. Under Ethics Opinion 431, if a retainer fee is paid as an advance payment for services to be performed, the amount of the fee must be related to the services to be performed, and if it is not,

it may be found excessive.[7]  Moreover, a "fee is not earned simply because it is designated as non-

refundable."  Tex. Eth. Op. 431 (1986) (located at 1986 WL 69161, *3 (Tex. Prof. Eth. Comm.)).

The Opinion concludes with the statement that "nonrefundable retainers are not inherently unethical,

but must be utilized with caution.  Such agreements pose . . . potential problems:  . . . the fee may be

excessive if not determined by relevant factors such as the degree of likelihood that other employment

will actually be preluded, and the experience, reputation and ability of the lawyer."  *Id*.

For all of these reasons, the Court concludes that in determining whether an attorney's fee

contract is unconscionable in Texas, the Court must simply determine if it is a reasonable contract.[8]

While Wells does not dispute the fact that a lawyer in Texas may be required to refund a fee which

is later found to be unreasonable (even under a so-called "non-refundable" contract), he argues that

the Court must measure the reasonableness of the fees paid under the Third Contract as of the *time

of contracting*, without the benefit of hindsight.

The Court disagrees, for at least two reasons.  First, Wells' reliance on the Rule's comments

is misplaced.  As relevant, the comments provide:

> A lawyer in good conscience should not charge or collect more than a reasonable fee,
> although he may charge less or no fee at all. The determination of the reasonableness
> of a fee, or of the range of reasonableness, can be a difficult question, and a standard
> of "reasonableness" is too vague and uncertain to be an appropriate standard in a

---

[7] Even a "true retainer," which is not a payment for services but rather is an advance fee to secure a
lawyer's services and pay him for the loss of the chance to accept other employment, must be refunded under
certain circumstances.  If the client discharges the attorney for cause before any opportunities have been lost, or if
the attorney withdraws voluntarily, then the attorney should refund an equitable portion of the retainer. Tex. Eth.
Op. 431 (1986) (located at 1986 WL 69161, *2 (Tex. Prof. Eth. Comm.)).

[8] Wells conceded at trial that under Texas's ethical guidelines, fees in criminal matters are subject to a
reasonableness determination, Tr. 1/9/06, 59:16-20, and that fees are subject to refund if they are excessive.  *Id*. at
60:4-5.  Milner also testified that attorney's fees are always subject to being determined to be reasonable. *Id.* at
148:14-16.  Moreover, Wells conceded at closing argument that the Third Contract is subject to the provisions of
Rule 1.04.  Audiotape: Hearing conducted 2/21/06 at 4:35:50 p.m. (on file with Court).

disciplinary action. For this reason, paragraph (a) adopts, for disciplinary purposes only, a clearer standard: the lawyer is subject to discipline for an illegal fee or an unconscionable fee. Paragraph (a) defines an unconscionable fee in terms of the reasonableness of the fee but in a way to eliminate factual disputes as to the fee's reasonableness. The Rule's "unconscionable" standard, however, does not preclude use of the "reasonableness" standard of paragraph (b) in other settings.

* * *

Two principal circumstances combine to make it difficult to determine whether a particular fee is unconscionable within the disciplinary test provided by paragraph (a) of this Rule. The first is the subjectivity of a number of the factors relied on to determine the reasonableness of fees under paragraph (b). Because those factors do not permit more than an approximation of a range of fees that might be found reasonable in any given case, there is a corresponding degree of uncertainty in determining whether a given fee is unconscionable. Secondly, fee arrangements normally are made at the outset of representation, a time when many uncertainties and contingencies exist, while claims of unconscionability are made in hindsight when the contingencies have been resolved. The "unconscionability" standard adopts that difference in perspective and requires that a lawyer be given the benefit of any such uncertainties for disciplinary purposes only. Except in very unusual situations, therefore, the circumstances at the time a fee arrangement is made should control in determining a question of unconscionability.

However, after considering the comment's explanation, the Court concludes that a "clearer standard" of unconscionability applies, and the use of hindsight is precluded, "*for disciplinary purposes only*," and that the Rule adopts a reasonableness standard "in other settings." *Id*. In settings other than disciplinary proceedings, the Rule specifies a non-exhaustive list of factors which the Court should consider, some of which by definition require the use of hindsight – *i.e.,* the "results obtained."

Second, as noted earlier, Texas courts have looked to the Restatement for guidance. The Restatement recognizes that a fee contract which is reasonable when entered into may be rendered unreasonable by a subsequent change in circumstances, citing, as an example, section 261 of the Restatement (Second) of Contracts. *Restatement (Third) of Law Governing Lawyers*, § 34 cmt. c (2000). Section 261 provides that "where, after a contract is made, a party's performance is made

impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." *Restatement (Second) of Contracts*, § 261 (1981). That, of course, is what happened here. The basic assumption of the Third Contract is that a new trial would occur. Upon the subsequent reversal of Judge Kendall's order by the Fifth Circuit, thereby reinstating Hughes Sr.'s conviction, the new trial became impossible. Thus, Wells' representation of Hughes Sr. in a new trial was made impracticable, and Wells did not breach the Third Contract by failing to perform. However, the lack of a new trial rendered the fee provided for in the Third Contract unreasonable, even if it was reasonable at the time of contracting (when the parties could not say with certainty whether a new trial would, in fact, occur).

Wells also argues that the fee called for by the Third Contract was not unconscionable or unreasonable because Rhonda is a sophisticated businesswoman who was more than capable of negotiating a fee agreement. He once again cites to the Comment to Rule 1.04, which states as follows:

> Two factors in otherwise borderline cases might indicate a fee may be unconscionable. The first is overreaching by a lawyer, particularly of a client who was unusually susceptible to such overreaching. The second is a failure of the lawyer to give at the outset a clear and accurate explanation of how a fee was to be calculated. For example, a fee arrangement negotiated at arm's length with an experienced business client would rarely be subject to question. On the other hand, a fee arrangement with an uneducated or unsophisticated individual having no prior experience in such matters should be more carefully scrutinized for overreaching. While the fact that a client was at a marked disadvantage in bargaining with a lawyer over fees will not make a fee unconscionable, application of the disciplinary test may require some consideration of the personal circumstances of the individuals involved.

There is no dispute that Rhonda is a sophisticated businesswoman. *See infra* at p. 32.

Nevertheless, the comment relied upon by Wells indicates that the sophistication of the client is to be considered in an "otherwise borderline" case. The Court does not believe that this is an "otherwise borderline" case. Moreover, this is not a disciplinary proceeding. Finally, if relevant at all, Rhonda's business savvy is not dispositive; rather, it must be viewed in light of the other circumstances present.

At the time of the Third Contract, Rhonda had already paid Wells significant sums of money. Her father had been temporarily freed from prison, but was facing an imminent new trial. Wells was, by virtue of his prior representation of Hughes Sr., intimately familiar with the case, and the most logical choice to represent Hughes Sr. at the impending trial. Rhonda testified that Wells told her father and her that it was critical that he (along with Udashen and Milner) participate in the trial, and that a decision about representation needed to be made quickly. Rhonda further testified that when she balked at the amount of his original fee quote, Wells basically told her that she did not have a choice if she wanted to keep her father out of jail. In short, according to Rhonda, Wells told her "that there was no attorney in Dallas that [she] would be able to get for anywhere near this on such short notice with all of the reading and everything else that . . . he had already done." Tr. 1/9/06, 270:16 - 271:5.

In light of the totality of the circumstances, the Court concludes that the Third Contract is properly reviewed under a reasonableness standard, notwithstanding Rhonda's business savvy. And, as previously held, the fee paid under the Third Contract is unreasonable in light of the fact that no new trial occurred.[9] Significantly, the Court's finding of an unreasonable fee is supported by the

---

[9] The Hughes also assert that the Third Contract is not a binding contract at all, because Udashen never signed it. Wells contends that the issue of enforceability on this ground was not fairly raised in the pleadings. However, in the Complaint, the Hughes allege that the Third Contract "was never executed by Udashen as required

testimony of the two lawyers that Wells wanted to assist him with the new trial – *i.e.*, Milner and

Udashen, both of whom are well-regarded criminal attorneys in Dallas. Tr. 1/9/06, 170:11-16 (where

Milner testified that $300,000 was not a reasonable fee for a trial that did not occur); *id*. at 228:1-5

(where Udashen testified that $300,000 "would have been on the high side if there is no trial"); *id*.

at 235:5-13 (where Udashen testifed that "I don't think that's a reasonable fee if – since there wasn't

a new trial").

---

by the agreement . . . [it] required the signature of Udashen. Wells told Hughes, Sr. and Rhonda that there would
be two lawyers under contract to handle the new trial." *Complaint*, ¶ 15. The Hughes also assert that "Wells made
false representations to Hughes Sr. and Rhonda that Udashen would be under contract to handle the matters and
Udashen was never under contract." *Complaint*, ¶ 40. In addition, the parties' Joint Pretrial Order lists as a
"Disputed Issue of Fact" the following: "the [Third Contract] was required to be executed by Udashen. The [Third
Contract] required the signature of Udashen. Wells told Hughes, Sr. and Rhonda that there would be two lawyers
under contract to handle the new trial." *Joint Pretrial Order, Disputed Issues of Fact*, ¶ h. In addition, the Joint
Pretrial Order lists as a Disputed Issue of Law "whether Plaintiff Rhonda Hughes is a creditor of the Debtor."
*Joint Pretrial Order, Disputed Issues of Law*, ¶ a. Further, the Hughes introduced at trial, without objection,
evidence that Udashen never signed the Third Contract. *See, e.g.*, Tr. 1/9/06, 92:4-8. Therefore, the Court
believes that the issue of the enforceability of the contract as a result of Udashen not signing it was fairly raised by
the pleadings, the Joint Pretrial Order, and the evidence at trial. Parenthetically, the Court notes that although the
Hughes argued at closing arguments that they "briefed" the issue for the Court, a review of their briefs shows that
they merely state, in a footnote, that "there is a question about whether there are even binding agreements since the
First and Third Agreements were never properly executed." *Reply Brief* at p. 13 n.5. A brief, however, normally
consists of legal arguments *and the authorities in support of them*. The Hughes provided the Court with no legal
authority for their after-the-fact argument.

     Nevertheless, the Court rejects the Hughes' argument that the Third Contract is unenforceable as to them
because it was not signed by Udashen. Rhonda, Hughes Sr., and Wells all signed the Third Contract, and it is
binding as to those parties. The absence of a signature on a contract does not necessarily destroy its validity. *ABB
Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc*., 115 S.W.3d 287 (Tex. App. – Corpus Christi
2003). Rather, as long as the parties give their consent to the terms of a contract, and there is no evidence of an
intent to require all signatures as a condition precedent to it becoming effective as a contract, signatures are not a
required factor in the making of a valid contract. *Id*. at 292. There is no evidence in this record that the Hughes
did not intend the Third Contrac to be binding until Udashen signed it. In fact, they had already accepted
Udashen's performance on the First Contract, although he hadn't signed that one, either. Wells testified that had a
new trial occurred, Udashen would have "sat second chair," "regardless of the fact that he didn't sign it." Tr.
1/9/06, 92:16-19. Wells testified that Udashen didn't sign as a result of "probably me not ever sitting down with
him after that point and saying, as our normal practice was, "Okay, if you sit second chair, we guesstimate first
time three-week trial, this two-week trial. Do you want $25,000? Do you want $35,000? What fee do you want?
And it just probably never got to that point . . . Most of the time, Gary didn't sign contracts. He just worked on the
cases." Tr. 1/9/06, 125:8-16. Udashen confirmed that he expected to sit second chair at the new trial, Tr. 1/9/06,
198:12-15, even though he didn't recall signing the Third Contract.

     With respect to the First Contract, it is undisputed that Udashen, although not a signatory to the contract,
has performed (and, in fact, is continuing to perform). A contract containing mutual obligations that has been
reduced to writing and signed by one of the parties can be accepted by the non-signing party by their conduct, thus
making it a binding agreement on both parties. *MG Bldg. Materials, Ltc. V. Moses Lopez Custom Homes, Inc.*,
179 SW3d 51 (Tex. App – San Antonio, 2005).

**Memorandum Opinion and Order**                                                  **Page 24**

Because the Court has concluded that Wells cannot retain the full fee paid under the Third Contract, the Court must now determine if this is the appropriate proceeding in which to liquidate the amount Wells must refund. In deciding this question, additional procedural information is necessary.

On June 11, 2005, the Hughes filed a proof of claim in the bankruptcy case (the "Claim"). The Claim is in the amount of $549,900, and is described as "Claim for refund of Fees $435,000, Interest ant 6% and Legal [sic]." On February 2, 2006, after the evidence was concluded in this trial but before the closing arguments, Wells objected to the Claim (the "Claim Objection"). The Court has not yet heard the Claim Objection.

However, in the context of this non-dischargeability action, the Court must determine that Wells owes a debt to the Hughes – *i.e.*, in order to determine that the Hughes have standing to bring this action. The Complaint itself is somewhat ambiguous as to whether the Hughes seek both a money judgement for $435,000 and a declaration of non-dischargeability, or whether they merely seek a judgment of non-dischargeability. Accordingly, during closing arguments, the Court inquired if the parties intended that the Court liquidate the Claim in this adversary proceeding. Both parties agreed that the Court should liquidate the amount of the debt to the extent it is alleged to be non-dischargeable. Accordingly, the Court will proceed to determine the amount to be refunded under the Third Contract.

For the reasons explained more fully below, the Court concludes that the Hughes are entitled to a refund of $165,000. Wells' retention of fees in excess of $135,000 is unreasonable in light of the fact that no new trial occurred. Stated another way, the Court finds that $135,000 is a reasonable fee for the services Wells actually rendered under the Third Contract. In coming to this

determination, the Court first looked to the terms of the Third Contract. The parties themselves set the amount of a reasonable fee to be paid for Wells' services for the period of time just prior to the time a government appeal was due. Specifically, and as noted previously, the Third Contract contained the Modified Non-Refundable Provision, which provided for a contractual refund of $175,000 to the Hughes if "this matter settles on or before August 23, 1999." Debtor Ex. 3 at p. 2. And, as noted previously, the government filed its appeal of the grant of the new trial on August 27, 1999 – just 4 days later. So, it appears that the parties agreed that a $125,000 fee was appropriate for the work Wells would be doing in both getting ready for the new trial and in attempting to negotiate a plea bargain with the government during the period from July 16, 1999, when the Third Contract was signed, through August 23, 1999. As Wells noted at trial, he "was on the hook in federal court for a 17-count federal indictment that had 300-plus exhibits on the government list, 50-plus witnesses on the government list, that took three weeks to try previously." Tr. 1/9/06, 82:16-20. Trial preparation was no doubt significant. But, even assuming that Wells worked on trial preparation solidly from August 24 through August 27 (when the government appealed and the trial setting was vacated), a reasonable fee for those services could not exceed $10,000.[10] While Wells and Udashen represented Hughes Sr. in connection with the government's appeal of the grant of the new trial, they were paid for those services separately under the Second Contract.

Accordingly, the Court concludes that a reasonable fee for Wells' services under the Third

---

[10]While Wells claims to have been working to get ready for the new trial, there is no specific evidence in the record regarding these 4 days. However, even assuming that Wells worked on Hughes Sr.'s case during those 4 days because of the looming trial setting, as his general testimony arguably suggests, the Court does not believe that he would have spent more than 7 billable hours per day for each of those days. Even assuming an hourly rate of $400 per hour, which this Court believes would have been a very high hourly rate for Wells in 1999, the incremental fees would not exceed $11,200. Wells testified that he billed on an hourly basis to review some documents in the Hughes Sr. case for J&G, and billed "at $250 an hour, something, some hourly rate." Tr. 1/9/06, 66:4-13. Accordingly, the Court finds that a reasonable fee for Wells' services for those 4 days is $10,000.

**Memorandum Opinion and Order** **Page 26**

Contract is $135,000, and that the Hughes are entitled to a refund of $165,000.

### ii. Did Wells Breach the Fee Contracts?

In the First Contract, Wells agreed to represent Hughes Sr. "through investigation and preparation" of the Habeas Petition. Debtor Ex. 1 at p. 1. Moreover, the fee paid covered "all review of records of the trial, legal research or any other work necessary to be done in connection with representation on this case under 28 U.S.C. § 2255." *Id.*

There is no dispute that Wells has failed to ask the district court presiding over the Criminal Suit to rule on the remaining grounds asserted in the Habeas Petition. As noted previously, there were multiple grounds for relief asserted in the Habeas Petition. And, as noted previously, Judge Boyle recommended that a new trial be granted after considering only the first ground raised by the Habeas Petition. Similarly, Judge Kendall granted the Habeas Petition based upon the first ground. Accordingly, no judge has yet ruled on the remaining grounds for relief asserted in the Habeas Petition.

Wells contends that the remaining grounds asserted in the Habeas Petition are not meritorious. Udashen agrees that the remaining grounds are not likely to be successful in obtaining Hughes Sr.'s release from prison. However, Wells clearly agreed to fully prosecute the Habeas Petition in the First Contract. So, the question becomes – does Wells failure to prosecute the remaining grounds asserted in the Habeas Petition constitute a breach of the First Contract when the prosecution of those remaining grounds is likely to be futile?

A breach is determined by comparing the terms of a contract with the actions of the alleged breaching party. *Enron Oil & Gas Co. v. Joffrion*, 166 S.W.3d 215 (Tex. App. – Tyler, 2003). Here, there is no question that the First Contract obligated Wells to fully prosecute the Habeas Petition and

that there are several grounds in the Habeas Petition that he did not prosecute. Accordingly, it appears that Wells breached the First Contract.

Wells' assertion that he is excused from further performance under the First Contract because further performance would be "futile" seems to be another way of saying that he substantially performed the First Contract by prosecuting (to a successful conclusion) the one meritorious ground contained in the Habeas Petition. Texas recognizes the doctrine of substantial performance as a defense to a breach of contract claim. *Smith v. Smith*, 112 SW3d 275 (Tex. App. – Corpus Christi, 2003). In determining substantial performance, there must be no wilful departure from the terms of the contract and no omission of essential points. *Id*. The party seeking relief under the doctrine bears the burden of proving that he did substantially perform in accordance with the agreement. *Id.*

However, substantial performance was neither pled in Wells' answer nor preserved in the Joint Pretrial Order. Nor was it clearly asserted at trial. Rather, Wells merely introduced evidence that further performance under the First Contract would be "futile."[11]

The Court need not resolve the thorny issue as to whether Wells may rely upon the doctrine of substantial performance as a defense to his breach of the First Contract because the Court concludes that the Hughes have failed to establish any damages flowing from Wells' breach. The evidence at trial clearly established that the remaining grounds in the Habeas Petition have no chance of success. Moreover, Udashen has agreed to represent Hughes Sr. in connection with the presentation of those remaining grounds at no charge. Therefore, the Hughes have failed to establish

---

[11]This defense may not have been pled in Wells' answer because a breach of contract claim was not specifically pled in the Complaint. The Complaint is not a model of clarity in stating the theory of Wells' liability to the Hughes. However, the underlying allegations in the State Court Suit, which form the basis of Wells' alleged liability to the Hughes, were admitted into evidence at trial by Wells. *See* Debtor Exs. 6 & 7 (the exhibits indicating the disposition of the Grievances – to which the state court petition was attached).

**Memorandum Opinion and Order** **Page 28**

any damages flowing from any technical breach of the First Contract by Wells.

Turning to the Third Contract, the services covered by that contract are for "Representation after Granting of Writ and New Trial." Debtor Ex. 3 at p. 1. The contract also recites that "[i]t is agreed that this employment is for the purpose of representation in the above-referenced matter" and "includes representation through all District Court proceedings but does not include a re-trial if the trial results in a hung jury." *Id*. While cryptic, the Court concludes that Wells agreed to represent Hughes Sr. in the Criminal Suit through a new trial of the indictment.

There is no evidence that Wells failed to provide any of the agreed upon services. Wells testified that he began prepraing for the new trial after the Third Contract was signed. While there was never a new trial, that was a risk that was known to the parties at the time the Third Contract was entered into, and his performance was discharged by the doctrine of impracticability. *See* Restatement (Second) of Contracts, § 261 ("where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."). Accordingly, there is no legal or factual basis upon which to conclude that Wells breached the Third Contract.

In sum, the First Contract is not unconscionable. While the First Contract was breached by Wells, the Hughes did not prove any damages. Wells did not breach the Third Contract. But, the Third Contract is unconscionable, and the Hughes are entitled to a refund of $165,000 of fees paid to Wells under that contract (the "Debt").

### B.     Is the Debt Dischargeable?

Exceptions to discharge should be construed in favor of the debtor. *Fezler v. Davis (In re*

*Davis)*, 194 F.3d 570 (5th Cir. 1999). The creditor bears the burden of proof and must establish each of the required elements of a claim under section 523(a) by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279 (1991); *In re Acosta*, 406 F.3d 367 (5th Cir. 2005).

As noted previously, the Hughes assert that the Debt is non-discharageable in accordance with section 523(a)(2)(A), (a)(4), and (a)(6). Each basis for non-dischargeablity will be addressed below.

### i.    Section 523(a)(2)

Section 523(a)(2) provides that a discharge under section 727 does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

11 U.S.C. §523(a)(2)(A). Although the general purpose of the Bankruptcy Code is to provide debtors with a fresh start, "section 523(a)(2)(A) is not designed to protect debtors; rather, it is designed to protect the victims of fraud." *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005).

In *Recoveredge LP v. Pentecost*, 44 F.3d 1284 (5th Cir. 1995), the Fifth Circuit distinguished between actual fraud on the one hand, and false pretenses and representations on the other. According to the Fifth Circuit, in order to be a false representation or false pretense, the representation must have been a knowing and fraudulent falsehood, describing past or current facts, that was relied upon by the other party. *Id*. at 1293. And, in order to prove nondischargeability on an actual fraud theory, the creditor must establish that the debtor made representations; at the time they were made the debtor knew they were false; the debtor made the representations with the intention and purpose to deceive the creditor; that the creditor relied on such representations; and that

the creditor sustained losses as a proximate result of the representations. *Id*. at 1293. In coming to its decision in *Recoveredge*, the Fifth Circuit declined to follow other circuits which had applied a uniform standard to all debts under section 523(a)(2).

More recently, however, the Fifth Circuit has stated, without distinguishing between the different torts encompassed by section 523(a)(2)(A), that for a debt to be non-dischargeable under that section, the creditor must show that (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance. *In re Acosta*, 406 F.3d 367, 371 (5th Cir. 2005).

An intent to deceive may be inferred from a reckless disregard for the truth or the falsity of a statement combined with the sheer magnitude of the resulting misrepresentation. *Id*. Furthermore, silence as to material facts can constitute a false representation. *Id*.

Here, the Hughes contend that Wells made numerous misrepresentations to induce them to enter into the Fee Contracts and to pay the fees called for by those contracts. At the outset of the Court's analysis of the alleged misrepresentations, the Court must make certain observations. First, the claims asserted against Wells in the State Court Suit were not fraud claims. Prior to the filing of the Complaint here, the Hughes had never pled any fraud claims against Wells relating to the Fee Contracts. Rather, the asserted claims were (i) to declare the Fee Contracts unconscionable and/or unenforceable and (ii) for breach of contract. Second, Hughes Sr. was in prison when the First Contract was entered into. Wells could not have made any misrepresentations to Hughes Sr. at that

time, as his discussions were only with Rhonda.[12]  Third, Rhonda is obviously very angry with Wells. Her anger was barely controlled when she testified at trial and her body language throughout the trial nearly sizzled with her anger.  Finally, Rhonda is a well educated and sophisticated business woman, who is no stranger to complex legal matters.  She has handled the family's funeral business for years, including after her father's criminal conviction.  She negotiated the sale of the family's funeral homes for several million dollars, and then she dealt with the purchaser's subsequent bankruptcy filing, successfully regaining possession of the funeral homes.  She actively participated in her father's and brother's defense during the original trial, working closely with the lawyers defending her family members.  And, she successfully sued and settled with Milner and Udashen on the claims asserted in the State Court Suit, with those lawyers agreeing to pursue the remaining grounds in the Habeas Petition for no additional compensation.

These observations cause the Court to question the veracity of at least some of Rhonda's trial testimony.  Rhonda remains so visibly angry with Wells that the Court is concerned that she has convinced herself of his "misrepresentations" to her, when no such "misrepresentations" were ever recited before the Complaint was filed here.  In short, some of Rhonda's testimony seems "convenient" now that the Hughes must prove that the Debt was incurred by fraud in order to have it excepted from Wells' discharge in bankruptcy.

The Court also has concerns over the veracity of some of Wells' trial testimony which also seems "convenient."  Given these concerns, the Court must evaluate the trial testimony of both Rhonda and Wells carefully and test that testimony against the Court's own experiences and common

---

[12]While Wells disputes Rhonda's standing to bring this action, the Court concludes that she does have standing.  While she was not the criminal client of Wells, she did sign the fee contracts and she funded those contracts.  If fees are owed back to anyone, they are owed back to Rhonda.

sense.

With this in mind, the Court turns to the alleged misrepresentations of Wells to the Hughes. First, the Hughes contend that Wells misrepresented that "he would work on the Criminal Suit through the completion of the [Habeas Petition]; yet he has wholly failed to complete his representation of [Hughes Sr.] by pursuing the remaining grounds in the [Habeas Petition]." Post-Trial Reply Brief of Plaintiffs, docket No. 33, (the "Reply Brief") at p. 8.

This alleged misrepresentation concerns the services to be provided under the First Contract. The timing of this alleged misrepresentation is not clear. Rhonda testified that Wells assured the Hughes that he would work on the Criminal Suit through the completion of the Habeas Petition shortly before Wells surrendered Hughes Sr. to the federal authorities after the Fifth Circuit reinstated Hughes Sr.'s conviction in October 2000. Of course, Wells also agreed in the First Contract to perform these services. *See* pp. 3-4, *supra*.

If the Hughes are relying on the representation contained in the First Contract or some verbal assurances given by Wells at the time of the execution of the First Contract, they failed to prove that at the time he made the representation, Wells knew he would not fully perform the First Contract. Moreover, they failed to prove that Wells made the representation with the intent to deceive the Hughes.

Alternatively, if the Hughes are relying on some representation made by Wells[13] at the time of Hughes Sr.'s surrender, the $135,000[14] paid to Wells under the First Contract was paid in February

---

[13]Wells denies that he made such a statement in connection with Hughes Sr.'s surrender. Rather, Wells testified that he told Hughes Sr. that there was nothing more that could be done, and that Hughes Sr. indicated that he understood that nothing more remained to be done.

[14]Of the $135,000 paid, only $125,000 was for fees – $10,000 was an expense deposit. Wells testified that he either spent the $10,000 on legitimate expenses or he may have refunded a few hundred dollars to Rhonda.

**Memorandum Opinion and Order** **Page 33**

1998, some 2 ½ years before the alleged misrepresentation was made. Accordingly, the monies paid to Wells under the First Contract were not paid based upon this alleged misrepresentation; the Hughes could not have actually and justifiably relied on this alleged misrepresentation in entering into the First Contract; there was no showing that at the time the alleged misrepresentation was made, Wells knew the representation was false or that he made the alleged misrepresentation with the intent to deceive the Hughes; and the Hughes could not have sustained losses as a proximate result of the alleged misrepresentation. Because several of the required elements of a section 523(a)(2)(A) claim were not established by the evidence, the first alleged misrepresentation does not provide the basis for the Debt to be excepted from discharge.

Second, the Hughes contend that Wells "made the misrepresentations that he would work on obtaining a sentence reduction yet he has filed no Petition for Commutation or Compassionate Plea." Reply Brief at p. 8. This alleged misrepresentation also concerns the services to be provided under the First Contract. Again, the timing of this alleged misrepresentation is not clear.

Wells clearly agreed to seek a sentence reduction for Hughes Sr. in the First Contract.[15] Moreover, Rhonda testified generically that Wells said he would do everything he could to obtain Hughes Sr.'s release when he was taking Hughes Sr. to be surrendered to the federal authorities after his conviction was reinstated.

If the Hughes are relying on the representation contained in the First Contract or some verbal assurances given by Wells at the time of the execution of the First Contract, they failed to prove that at the time he made that representation, Wells knew he would not fully perform the First Contract.

---

[15]However, under the First Contract, Wells agreed to seek a sentence reduction arising out of the relief sought in the Habeas Petition. If Wells had agreed to seek sentence reductions for Hughes Sr. more generally in the First Contract, there would have been no need for the Second Contract. And, significantly, no claims have ever been asserted against Wells under the Second Contract.

**Memorandum Opinion and Order** **Page 34**

Moreover, they failed to prove that Wells made that representation with the intent to deceive the Hughes.

Alternatively, if they are relying on some representation made by Wells[16] at the time of Hughes Sr.'s surrender, the $135,000 paid to Wells under the First Contract was paid in February 1998, some 2 ½ years before the alleged misrepresentation was made. Accordingly, the monies paid to Wells under the First Contract were not paid based upon this alleged misrepresentation; the Hughes could not have actually and justifiably relied on this alleged misrepresentation in entering into the First Contract; there was no showing that at the time the alleged misrepresentation was made, Wells knew the representation was false or that he made the alleged misrepresentation with the intent to deceive the Hughes. Finally, the Hughes could not have sustained losses as a proximate result of the alleged misrepresentation for at least two reasons: (i) the timing discrepancy noted above (the alleged representation having been made years after the contract was entered into) and (ii) because the remaining grounds asserted in the Habeas Petition have "zero" chance of success according to Udashen, the lawyer who is representing Hughes Sr. in presenting those remaining grounds to the district court.[17] Because several of the required elements of a section 523(a)(2)(A) claim were not established by the evidence, the second alleged misrepresentation does not provide the basis for the Debt to be excepted from discharge.

---

[16]Again, Wells denies that he made such a statement in connection with Hughes Sr.'s surrender.

[17]While Udashen was reluctant to address these issues because they remain pending before the district court in the Criminal Suit, he testified that he believed there was no chance of obtaining Hughes Sr.'s release on the remaining grounds in the Habeas Petition. Udashen did not think his arguments based upon the Supreme Court's recent decision in *United States v. Booker*, 543 U.S. 220 (2005), while characterized by the government as "creative," would be successful. Nor did he think a Presidential pardon was obtainable. According to Udashen, the only possible avenue for Hughes Sr.'s release is a compassionate release due to Hughes Sr.'s recent illnesses. In short, Udashen testified that the only hope for Hughes Sr.'s release is based upon the fact that he is a sick old man who has already served a considerable amount of his sentence.

**Memorandum Opinion and Order** **Page 35**

Third, the Hughes contend that Wells "made the misrepresentations to Hughes Sr. and Rhonda that he was part of a law firm." Reply Brief at p. 8. Rhonda testified that Wells made this representation to her prior to entering into the First Contract. Moreover, Rhonda testified that she was left with the impression that Wells worked for a law firm because of (i) the signage outside the door of the lawyers' offices, (ii) the letterhead that Wells used that had several lawyers names on it, and (iii) the signature block on filed pleadings that also used several lawyers names.

Conversely, Wells testified that his relationship with Milner, Udashen, and the other lawyers identified on his letterhead was simply an office sharing arrangement; the various lawyers were not partners of each other or of a law firm. Milner and Udashen confirmed Wells' testimony in this regard. Moreover, Wells emphatically denied that he ever expressly represented that he was part of a law firm to the Hughes. Wells testified that the issue never came up at all. Finally, Wells points to the terms of the Fee Contracts (neither contract references the hiring of a law firm; nor is there a signature block for a law firm), arguing that if Rhonda thought she was hiring a law firm, why didn't the law firm sign those contracts?[18]

This is an example of Rhonda's trial testimony being partially incredible. While the Court believes that Rhonda was under the impression that she was dealing with a law firm and that Wells was a member of that firm (not just a group of office sharing lawyers), the Court finds it incredible that she and Wells had an express conversation about the existence of a law firm. Rather, the Court finds Wells' testimony that Rhonda and he never discussed the existence of a law firm credible.

Moreover, the Court finds that Rhonda's impression of the existence of a law firm originated

---

[18]Ironically, based upon Wells' objection, the J&G fee contract was not admitted into evidence. However, it did contain a signature block for the firm, supporting Wells' contention that Rhonda knew how to bind a law firm under a fee contract.

not with Wells, but with Zachry at J&G. Rhonda asserts that Zachry told her to "retain [Wells] with the firm of Milner, Lobel, Goransen, Sorrels, Udashen and Wells," Joint Pre-Trial Order, docket no. 11, at ¶ 4(b), when he recommended a new lawyer to her. So, Rhonda went to see Wells thinking that he was part of a law firm. While the letterhead Wells used, and the signage outside the office door, clearly furthered her impression of a law firm, there was no evidence to suggest that Wells used that letterhead, or placed the signage on the outside door, with the intent to deceive the Hughes. Moreover, on cross examination, Rhonda admitted that she did not know if she would have refused to hire Wells if she had known he was not affiliated with a law firm. Tr. 1/9/06, 284:2-6. Accordingly, there is no evidence to support a finding of actual and justifiable reliance by the Hughes on the existence of a law firm. Nor did Rhonda establish any losses the Hughes sustained as a proximate cause of the absence of a law firm. While she made several arguments about potential losses – *i.e.*, that she might have been better able to collect the Debt from a firm than from Wells, those arguments are pure speculation on her part, not actual losses. Because several of the required elements of a section 523(a)(2)(A) claim were not established by the evidence, the third alleged misrepresentation does not provide the basis for the Debt to be excepted from discharge.

Fourth, the Hughes contend that Wells "made the misrepresentation that Udashen would be under a signed contract to handle the matters under the [Fee Contracts]." Reply Brief at p. 8. While Wells did represent that Udashen would sign the Fee Contracts, there is no evidence to suggest that Wells knew his representation was false at the time he made it; that Wells made the representation with the intent to deceive the Hughes; or that the Hughes sustained losses as a proximate result of the misrepresentation. While Udashen did not sign the First Contract, he did provide substantial services to Hughes Sr. that were called for by that contract, and he was paid for those services by

Wells – out of the $125,000 paid by the Hughes to Wells under the First Contract.[19] Because several of the required elements of a section 523(a)(2)(A) claim were not established by the evidence, the fourth alleged misrepresentation does not provide the basis for the Debt to be excepted from discharge.

Fifth, the Hughes contend that Wells "used false pretenses when he told the Hughes that if the $300,000 was not paid he would be permitted to withdraw from the case four weeks before the scheduled new trial." Reply Brief at p. 8. Rhonda further complains that Wells never explained the procedures for withdrawal.[20] Hughes Brief at p. 19. And, Rhonda points to certain testimony of Milner who stated that it was unlikely that a federal judge would let a lawyer withdraw from a case once he's attorney of record.[21] *Id.* at 20.

This alleged misrepresentation concerns the funding of the Third Contract. And, not surprisingly, Wells has a slightly different version of what he told the Hughes. Wells testified that he told Rhonda that if she didn't go ahead and fund the Third Contract, he would ask Judge Kendall for permission to withdraw and that he thought the judge would let him withdraw for non-payment of fees.

However, even assuming that Wells told her that Judge Kendall would permit him to withdraw, there is no evidence that Wells knew this statement to be false when he made it; or that he

---

[19]While Udashen was not contractually obligated to provide these services, he is continuing to represent Hughes Sr. before the district court in connection with his recent request that the district court dispose of the remaining grounds asserted in the Habeas Petition. Udashen is providing these services for no additional compensation based upon a settlement of claims asserted against him by the Hughes in the State Court Suit.

[20]That begs the question – did Rhonda ask Wells about the procedure for withdrawal in federal court?

[21]Rhonda also points to certain testimony of Wells when his lawyer asked what happens if you don't get a big enough fee and you ask the Court to let you out of the case. Wells answered "[y]ou don't get out." Tr. 1/09/06, 121:13-18. However, from the Court's perspective, not being allowed to withdraw from representation because you negotiated for too little fee is not the same as being allowed to withdraw because your client has not paid you at all.

made the statement with the intention and purpose to deceive the Hughes. Because at least two of the required elements of a section 523(a)(2)(A) claim were not established by the evidence, the fifth alleged misrepresentation does not provide the basis for the Debt to excepted from discharge.

Sixth, the Hughes contend that "Wells made a false representation that there would be a new trial in September 1999 justifying the payment of $300,000 in August of 1999." Reply Brief at pp. 8-9. For the reasons explained more fully below, the Court finds that the Hughes have not shown by a preponderance of the evidence that Wells made such a representation to them. First, the Hughes do not specifically identify the timing of the alleged misrepresentation. But, whether they allege it was made at the time of the negotiation of the Third Contract or whether they allege it was made at the time the Third Contract was funded – in either case, the new trial had been set by Judge Kendall for September. Therefore, any such representation was not false when it was made. Theoretically, the representation could still have been false if Wells knew at the time he made it that the government would appeal and the Fifth Circuit would ultimately reverse the grant of a new trial. While Wells knew that the government would likely appeal, Wells could not have known the outcome of any such appeal. And, theoretically, if Wells opined that there would be a new trial, his opinion could form the basis of a false representation claim, but only if he did not hold the expressed opinion. *In re Townsley*, 195 B.R. 54 (Bankr. E.D. Tx. 1996). There is no evidence that Wells did not believe that a new trial would occur.

Moreover, and although Rhonda testified that Wells continually assured her that there would be a new trial, Wells painted a different picture. Wells testified that he consistently told the Hughes that the government would appeal. He also testified that he personally felt that the Hughes had "a stronger chance of affirmance because of the kind of opinion going up, versus the normal appeal in

a criminal case going up," Tr. 1/9/096 89:18-90:6, but that he "didn't get into depth [about the likelihood of affirmance] with [Rhonda]." *Id*. Wells testified that at the time the Hughes paid the $300,000, he told them that "the judge had set a new trial, and that Kendall would hold a trial if we didn't work something out. Obviously, save and except this Circuit doing something." Tr. 1/9/06, 89:13-17.

The evidence of a misrepresentation is equivocal at best, because at the time of the alleged representation that there would be a new trial, the representation was true, since a new trial was in fact scheduled. It could only have been false if Wells knew the conviction would be reinstated by the Fifth Circuit, which Wells could not have known at the time of the representation. To the extent it was only a statement of Wells' opinion that a new trial would occur, the opinion is not actionable as being false unless the Hughes proved that Wells did not hold that opinion, which they have not proven. Lastly, the Court is not persuaded that Wells guaranteed the Hughes that a new trial would occur. Therefore, the Court concludes that the Hughes have failed to prove by a preponderance of the evidence that a misrepresentation was made. Therefore, there is no basis upon which the Debt may be excepted from discharge.

Finally, the Hughes contend that "Wells made a misrepresentation when he indicated that the fees his firm was paid were non-refundable." Reply Brief at p. 9. Initially, the Court notes that it has rejected the contention that Wells affirmatively represented to the Hughes that he practiced law with a law firm. *See* pp. 35-36, *supra*. Moreover, as noted previously, non-refundable fee agreements in Texas are not illegal; they are apparently common in criminal defense representations. *See* p. 10, *supra*. And, absent a later finding that the contract is unconscionable, the fees are, in fact, non-refundable. *See* pp. 16-20, *supra*.

The Hughes' reliance on a Colorado case to support their premise is unpersuasive in light of the case law in Texas that recognizes the legality of such agreements. There is simply no evidence that at the time the parties entered into the Third Contract, Wells knew that the new trial would not occur and thus a portion of the fees might someday be deemed excessive and therefore need to be refunded. Accordingly, there is no evidence that Wells knew his representation regarding the non-refundability of his fees was false at the time that he made the statement or that the representation was made with the intent to deceive the Hughes. As such, the Hughes have failed to prove essential elements of their section 523(a)(2)(A) claim and the Debt is not excepted from discharge.

### ii. Section 523(a)(4)

Under section 523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may not be discharged in bankruptcy. 11 U.S.C. § 523(a)(4). The Hughes make no claim that Wells committed any fraud or defalcation while acting in a fiduciary capacity. Rather, the Hughes contend that the Debt is non-dischargeable under section 523(a)(4) because "Wells retained and ultimately spent for his own use and enjoyment funds that rightfully belonged to the Hughes." Hughes' Brief at p. 27. While acknowledging that Wells initially had a right to possess the funds when the Fee Contracts were entered into, the Hughes further contend that Wells "never acquired the right to the $300,000 that was delivered to him for a new trial." *Id*. Finally, the Hughes contend that these funds should have been placed into a trust account. *Id*. at pp. 27-28. According to the Hughes, "[b]y retaining such funds [once it became clear that there would be no new trial], Wells embezzled money from the Hughes in the amount of $300,000." *Id*. at p. 28.

The Fifth Circuit defines embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re*

*Miller*, 156 F.3d 598, 602 (5th Cir. 1998). To meet the definition of "embezzlement," there must be proof of the debtor's fraudulent intent in taking the property." *Id*. at 602-3 (*quoting Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996)). In contrast, larceny is defined as the "'fraudulent and *wrongful taking and carrying away of the property of another* with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property.' Thus, what makes a debtor's actual taking of another's property wrongful is his mental state (intent or objective)." *Pool v. Johnson*, No. CIV.A. 3:01-CV-1168L, 2002 WL 598447 at *2 (N.D. Tx. Apr. 15, 2002). Whether the misconduct falls within the definition of embezzlement or larceny under section 523(a)(4), depends on how the debtor came into possession of the property, but "fraudulent intent is the *sine qua non*" of both. *Id.*

Applying this standard here, the question becomes whether Wells fraudulently appropriated the funds paid by the Hughes under the Third Contract. In answering this question, the Court will look first to the terms of the Third Contract. Wells was under no contractual obligation to place the $300,000 paid to him under the Third Contract in a trust account. Rhonda apparently knew how to bargain for such a provision in fee arrangements, as the First Contract contained an express requirement that an expense deposit be placed in a trust account. Debtor Ex. 1. While Milner and Udashen testified that it would have been better practice to place such funds in a trust account, Wells was under no contractual obligation to do so. Moreover, while the Hughes were potentially entitled to a refund of a portion of the fees (if the matter settled before August 23, 1999), there was nothing in the Third Contract that required Wells to place the potential $175,000 refund in a trust account. Again, while it would have been prudent for Wells to do so, there is no evidence that his failure to do was a breach of any contractual obligation.

It is true that Rule 1.14 of the Texas Disciplinary Rules of Professional Conduct requires that

a lawyer holding funds belonging in whole or in part to a client be placed in a separate "trust" account. However, the preamble to the rules states that the rules "do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action." Tex. Gov't. Code Ann. T.2, Subt.G, App. A, Art. 10, § 9 Preamble ¶ 15 (Vernon 2005). Similarly, the Ethics Opinions issued by the Supreme Court of Texas's Professional Ethics Committee, which also impose an obligation to place funds in a trust account where ownership of the funds is questionable, do not impose civil liability upon an attorney but merely interpret the Rules and clarify the circumstances under which the attorney may be disciplined.

An attorney may, however, be found liable in tort for breach of fiduciary duty when the attorney improperly retains client funds or fails to deliver funds belonging to the client. *Gibson v. Ellis*, 126 S.W.3d 324 (Tex. App. – Dallas, 2004); *Goffney v. Rabson*, 56 S.W.3d 29 (Tex. App. – Houston [14 Dist.] 2001). An attorney has a duty to make prompt delivery to a client of all funds in the possession of the attorney which the client is entitled to, and a breach of that duty by failure to remit client funds gives rise to a cause of action sounding in tort. *Avila v. Havana Painting Co.*, 761 S.W.2d 398 (Tex. App. – Houston [14 Dist.] 1988). But, although Wells is now, as a result of this Memorandum Opinion and Order (which determines that the fees paid were excessive) obligated to refund fees, there has been no prior breach of this duty. This case is therefore unlike the typical breach of fiduciary duty case against an attorney, where the case is brought after an attorney has failed to remit funds clearly belonging to the client. *See, e.g. Avila*, 761 S.W.2d at 399 (failure to remit to client funds he was hired to collect on client's behalf).

In addition, as noted earlier, embezzlement requires proof of fraudulent intent. There is simply no evidence in the record that Wells intended to defraud the Hughes when he placed the fee into his general account instead of into a trust account. And, as noted earlier, non-refundable

retainers are legal in Texas and common among members of the criminal defense bar. In short, the Hughes failed to prove that Wells had the requisite intent to fraudulently appropriate the fees paid to him, and the Debt is not excepted from discharge under section 523(a)(4).

### iii.    Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt incurred for willful and malicious injury by the debtor to another entity or to the property of another entity. An injury is "willful and malicious" where there is "either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998).

Because a debtor will rarely, if ever, testify to acting in a willful and malicious manner, a number of cases have held that both elements may be inferred from the circumstances surrounding the injury. *See, e.g., In re Kennedy,* 249 F.3d 576 (6th Cir. 2001) (defamatory statements which were inherently injurious gave rise to inference of intent to injure sufficient to support a § 523(a)(6) claim); *In re Magpusao,* 265 B.R. 492 (Bankr. M.D. Fla. 2001) (intent may be inferred from debtor's conduct and totality of circumstances); *In re Sweeney,* 264 B.R. 866 (Bankr. W.D. Ky. 2001) (willful and malicious injury proven indirectly, by inference, by proof that debtor understood that he was substantially certain to harm creditor or creditor's property where debtor converted insurance proceeds from collateral upon which creditor had a lien); *In re Sintobin*, 253 B.R. 826 (Bankr. N.D. Ohio 2000) (intent inferred where debtor encouraged children to vandalize landlord's house by spray-painting walls); *In re Halverson*, 226 B.R. 22 (Bankr. D. Minn.1998) (malice inferred as a matter of law where debtor engaged in sexual activity with his eleven year old niece); *In re Adams,* 147 B.R. 407 (Bankr. W.D. Mich. 1992) (intent inferred where debtor sped through red light at congested intersection; debtor should have known that his act was substantially certain to result in serious injury to some person). However, in each of these cases (where a court has held that intent to cause willful

and malicious injury can be inferred), the *conduct* was proven, and the intent was inferred by virtue of the egregiousness of the conduct.

Cases decided after the Supreme Court's decision in *Kawaauahau v. Geiger,* 523 U.S. 57 (1998), have recognized that an omission, as opposed to an act, can be "wilfull and malicious" within the meaning of section 523(a)(6). *See, e.g., In re Jercich*, 238 F.3d 1202 (9th Cir. 2001) (failure to pay wages owed pursuant to employment contract despite ability to do so, and instead using funds for personal investments, was deliberate choice and willful and malicious under 523(a)(6)); *In re Docteroff*, 133 F.3d 210, 216 (3rd Cir. 1997) (concluding that debtor inflicted willful and malicious injury within the meaning of section 523(a)(6) when the debtor intentionally disregarded his duty to disclose his diversion of creditor's progress payments for yacht construction for his personal use, and this diversion impaired yacht builder's financial ability to operate, resulting in builder's inability to construct yacht); *In re Vestal*, 256 B.R. 326, 328 (Bankr. M.D. Fla. 2000) ("for an act *or omission* of a debtor to qualify as willful and malicious ... a debtor must have intended not only the act *or omission,* but also the injury which resulted") (emphasis added).[22]

In addition, a *per se* rule that an act of omission can never serve as the basis for a section 523(a)(6) claim would run counter to the body of common law respecting torts. A "negative act" is defined as "the failure to do something that is legally required; a nonocurrence that involves the breach of a legal duty to take positive action." Black's Law Dictionary 26 (8th ed. 2004). An omission is therefore actionable in tort where there is a duty to act. The leading treatise on torts has

---

[22]Similarly, cases construing section 523(a)(2) have held that an omission is actionable under that section. Where a complaint alleges that the debtor improperly failed to disclose material facts, specifically that he had a duty to disclose and that he failed to, the complaint states a claim under 523(a)(2)(A). A "finding of fraud does not require an affirmative statement . . . [it] may be predicated on a failure to disclose [a] material fact. [C]ourts have overwhelmingly held that a debtor's silence regarding material fact can constitute a false representation actionable under section 523(a)(2)(A)." *In re Docteroff*, 133 F.3d 210, 216 (3rd Cir. 1997) (quoting *In re Van Horne,* 823 F.2d 1285, 1288 (8th Cir.1987)).

stated:

> In the determination of the existence of a duty, there runs through much of the law a distinction between action and inaction.  In the early common law one who injured another by a positive, affirmative act, was held liable without any great regard even for his fault.  But the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer harm because of his omission to act.  Hence there arose very early a difference, still deeply rooted in the law of negligence, between "misfeasance" and "nonfeasance" - that is to say, between active misconduct working positive injury to thers and passive inaction or a failure to take steps to protect them from harm.... Liability for nonfeasance was therefore slow to receive recognition in the law.  It first appears in the case of those engage in "public" callings, who, by holding themselves out to the public, were regarded as having undertaken a duty to give service, for the breach of which they were liable.... During the last century, liability for "nonfeasance" has been extended still further to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action. ... for "nonfeasance" it is necessary to find some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act.
>
> In theory the difference between the two is fairly clear; but in practice it is not always easy to draw the line and say whether conduct is active or passive.... The question appears to essentially one of whether the defendant has gone so far in what he has actually done, and has got himself into such a relation with the plaintiff, that he has begun to affect the interest of the plaintiff adversely, as distinguished from merely failing to confer a benefit upon him.

W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 56, at pp. 373-375 (5th ed. 1984).

Nevertheless, in order to prove a claim under section 523(a)(6) premised upon an omission, the creditor must meet a very high burden – *i.e.*, he must show that the failure to act was intentional, as opposed to merely negligent or reckless.  *See, e.g. In re Vestal*, 256 B.R. 326 (Bankr. M.D. Fla. 2000) (failure to monitor accounts resulting in injury to plaintiff could theoretically support a claim under 523(a)(6), but debt held dischargeable because plaintiff proved only that the failure to monitor was negligent).  The creditor must further show that the failure to act was with "either an objective certainty of harm or a subjective motive to cause harm."  *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998).

Here, the Hughes make two arguments for non-dischargeability under section 523(a)(6). First, that Wells "caused willful and malicious injury to the property of Rhonda by retaining funds in the amount of $300,000 for a new trial that never occurred. By retaining such funds Wells intentionally prevented Rhonda and her father from employing other counsel to work on her father's case." Hughes' Brief at p. 29. And, second, that Wells "caused willful and malicious injury to the person of [Hughes Sr.] by failing to render services and deliberately and intentionally leaving Hughes Sr. in federal prison when pursuit of the claims filed by Wells on Hughes Sr.'s behalf might have permitted his release." *Id*.

For the reasons explained more fully below, neither argument is persuasive. The Hughes' first argument is premised upon an omission or a failure to act – *i.e*, Wells' failure to return funds to Rhonda is alleged to have prevented the Hughes from retaining other counsel to work on Hughes Sr.'s case. To prevail, the Hughes must establish that (i) Wells had a duty to act, (ii) his failure to act – *i.e*., to return the funds, was intentional, and (iii) Wells failed to return the funds with "either an objective certainty of harm or a subjective motive to cause harm." *In re Miller*, 156 F.3d at 606. While Wells' failure to return the funds was certainly intentional, there is no evidence to suggest that he had a duty to return the funds or that he kept the funds with the subjective motive to cause the Hughes' harm. Wells kept the money because he thought he was legally entitled to do so under the terms of the Third Contract. Moreover, there is no evidence to suggest that Wells kept the money with an objective certainty that his retention of the funds would prevent Rhonda from employing other counsel to work on Hughes Sr.'s case. In truth, there remains very little to be done for Hughes Sr. – he was convicted of a serious crime and he must live with the consequences of his criminal conviction.

The Hughes' second argument is also premised upon an omission or a failure to act – *i.e*,

Wells' failure to render services, thereby "deliberately and intentionally leaving Hughes Sr. in federal prison." Hughes' Brief at p. 29. Again, while Wells' failure to render further services to Hughes Sr. was certainly intentional – *i.e.*, Wells knew Rhonda thought there was still work to be done and he did not do that additional work, there is no evidence to suggest that he failed to perform those services with the subjective motive to cause harm to Hughes Sr. Rather, Wells believes that advancing the remaining grounds in the Habeas Petition is futile because those grounds are not meritorious. Udashen agrees with that assessment, but is willing to advance the claims on Hughes Sr.'s behalf as part of his settlement with Rhonda. Finally, there is no evidence to suggest that Wells failed to perform those services with an objective certainty that his failure would cause Hughes Sr. to remain in prison. In fact, none of the lawyers think the remaining grounds in the Habeas Petition will be successful in obtaining Hughes Sr.'s release from prison. Moreover, Texas follows the rule that when a convict sues his attorney in tort, the criminal conduct is the only cause of any injury suffered as a result of a conviction. In other words, it is the illegal conduct rather than the acts of a convict's counsel that is the cause in fact of any injury flowing from the conviction. The plaintiff/convict may negate the sole proximate cause bar to his claim for malpractice in connection with that conviction only if he has been exonerated. *Peeler v. Hughes & Luce*, 909 S.W.2d 494 (Tex. 1995). Accordingly, the Hughes' alleged injury – *i.e.*, that Hughes Sr. remains in prison, is the result of his conviction and not the result of any conduct or failure to act by Wells. *See also Van Polen v. Wisch*, 23 S.W.3d 510 (Tex. App. – Houston [1st Dist.] 2000) (stating that where the claim of injury sounds in tort, the plaintiff must establish that he is innocent to prove that his attorney's conduct was the sole proximate cause of his injury).

For those reasons, the Debt is not excepted from discharge under section 523(a)(6).

## III. Conclusion

The Hughes failed to prove that the First Contract is unconscionable. Accordingly, the Hughes are not entitled to any refund of monies paid under the First Contract. While the Hughes proved that Wells breached the First Contract, they have failed to prove any damages resulting from that breach.

The Hughes failed to prove any breach of the Third Contract, but they did prove that the Third Contract is unconscionable. Accordingly, the Hughes are entitled to a refund in the amount of the Debt.

However, the Hughes failed to prove that the Debt is excepted from Wells' discharge under section 523(a)(2)(A), (a)(4), and/or (a)(6) of the Bankruptcy Code. Accordingly, the relief requested in the Complaint must be denied.

**SO ORDERED**.

# # # End of Order # # #